UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

ARIEL FLORES,

                                    Plaintiff,

                    -v-

THE CITY OF NEW YORK; New York City Police Department
Officer ("P.O.") CHRISTOPHER LABATE, Sergeant ("SGT.")
DANIEL SCHWARZ, Detective ("DET.") MICHAEL
PELLEGRINO (Shield No. 967), P.O. PEDRO ROMERO (Shield
No. 04669), SGT.TIMOTHY CONLON (Shield No. 3053), P.O
"FNUK" CIANCELLO (or CHINCULO), SGT. ANDREA
BASKINGER (Shield No. 3032), P.O.KRISTEN BAJANA (Shield
No. 14762), P.O. FELIX ACOSTA (Shield No. 11482), P.O.
VICTOR MATOS (Shield No. 26538), P.O.KEITH CHENG
(Shield No. 644), SGT.GILBERT VEGA (Shield No. 4451), P.O.
EIEL STEWART (Shield No. 1274), P.O."FNUK" CHIN, P.O.
CLAUDIO PAULA (Shield No. 27938), P.O. TERESA SBERNA
(Shield No. 30226), SGT. ANDREW MICHEL (Shield No.
05082), Captain ("CPT.") ERIC OLSEN, P.O. STEPHEN
MARKOWSKI (Shield No. 11981), and P.O. JOHN DOE 1
through P.O. JOHN DOE 4 (the name John Doe being fictitious, as
the true names and shield numbers are presently unknown), in their
individual and official capacities,

                                    Defendants.

--------------------------------------------------------------------------------x

| |
|---|
| **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| **10-CV-3089 (WHP)** |

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and

   Fourteenth Amendments of the Constitution of the United States, under the Civil Rights Act

   of 1987, *as amended*, codified as 42 U.S.C. § 1983, and pendant claims under the

   Constitution and laws of the State of New York.

1

2.  Plaintiff ARIEL FLORES' rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT unconstitutionally and without any legal basis shot, seized, detained, arrested and used gratuitous, unlawful force against the plaintiff. By reason of defendants' actions, including their unreasonable and unlawful conduct, search and protracted detention, plaintiff was deprived of his constitutional rights.

3.  Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

5.  Pursuant to New York State General Obligations Law § 50-G, the plaintiff filed a timely Notice of Claim with the New York City Comptroller on or about July 29, 2009. Thus, this Court has supplemental jurisdiction over plaintiff's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a). Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

6.  Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiff's claim arose in the Southern District of New York.

7.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8.  Plaintiff FLORES is, and was at all times relevant to this action, a resident of the County and State of New York.

2

9.   Defendant, THE CITY OF NEW YORK, is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The Defendant assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by THE NEW YORK CITY POLICE DEPARTMENT ("NYPD").

10.  Defendants Police Officer ("P.O.") CHRISTOPHER LABATE, Sergeant ("SGT.") DANIEL SCHWARZ, Detective ("DET.") MICHAEL PELLEGRINO (Shield No. 967), P.O. PEDRO ROMERO (Shield No. 04669), SGT. TIMOTHY CONLON (Shield No. 3053), P.O. "FNUK" CIANCELLO (or CHINCULO), SGT. ANDREA BASKINGER (Shield No. 3032), P.O. KRISTEN BAJANA (Shield No. 14762), P.O. FELIX ACOSTA (Shield No. 11482), P.O. VICTOR MATOS (Shield No. 26538), P.O. KEITH CHENG (Shield No. 644), SGT. GILBERT VEGA (Shield No. 4451), P.O. EIEL STEWART (Shield No. 1274), P.O. "FNUK" CHIN; P.O. CLAUDIO PAULA (Shield No. 27938), P.O. TERESA SBERNA (Shield No. 30226), SGT. ANDREW MICHEL (Shield No. 05082), Captain ("CPT.") ERIC OLSEN, P.O. "FNUK" MARKOWSKI, and P.O. JOHN DOE 1 through P.O. JOHN DOE 4 (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.  The individual defendants are being sued herein in their individual and official capacities.

11.  At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the

NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

12. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for plaintiff's rights.

13. At all relevant times, the defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

14. The events herein described principally occurred July 22, 2009 in the vicinity of 188th Street and Amsterdam Avenue in the County and State of New York.

15. In the late afternoon twilight hours of July 22, 2009, plaintiff FLORES was at the apartment of his child's mother, located in the vicinity of 133rd Street and Seventh Avenue in New York County.   Three (3) of plaintiff's acquaintances, *to wit*, Danny Heredia ("Heredia"), Steven Liriano ("Liriano"), and Maximo Peguero  ("Peguero") drove the plaintiff's car ("Cadillac") to pick up the plaintiff from said apartment.

16. When his acquaintances came to pick him up in the Cadillac, plaintiff FLORES sat in the seat behind the passenger.  Peguero stayed in the driver's seat as the four (4) of them began driving towards the plaintiff's apartment, located at 382 Wadsworth in New York County.

17. After driving north on Broadway, Peguero made a right turn onto 188th Street in New York County.

18. The Cadillac stopped behind a passenger car at a red light near the intersection of 188th Street and Amsterdam Avenue.

4

19. Without warning, and while the Cadillac was stationary behind the passenger car at the red light, several of the individual defendants, including but not limited to defendant P.O. LABATE, SGT. SCHWARZ, and DET. PELLEGRINO ran towards the Cadillac from the front, with their guns drawn.

20. Just as the plaintiff noticed these and other individual defendants in plainclothes running towards the Cadillac, the aforementioned individual defendants opened fire at the Cadillac and its occupants.

21. Approximately five (5) or six (6) bullets fired by the individual defendants struck the Cadillac, shattering the front windshield and passenger side window.

22. Plaintiff FLORES instinctively ducked down in order to protect himself.  However, one (1) of the individual defendants' bullets had already grazed him in the back of his head.

23. As the plaintiff stayed low to stay safe, he noticed Peguero slumped over the steering wheel.

24. Mere moments after noticing Peguero slumped over the wheel, several of the individual defendants opened the rear passenger door and pulled the plaintiff out of the Cadillac, face-down on the pavement.  Upon information and belief, the officers who removed plaintiff from the vehicle include but are not limited to P.O. ROMERO, SGT. CONLON, P.O. CIANCELLO (or CHINCULO), and SGT.  BASKINGER.

25. Said individual defendants immediately rear-cuffed the plaintiff.

26. Upon information and belief, while these individual defendants were rear-cuffing the plaintiff, one (1) of them bumped defendant SGT. CONLON's arm, causing SGT. CONLON to drop his firearm onto the ground.

27. One (1) of the other aforementioned individual defendants saw SGT. CONLON's gun laying on the ground and yelled "GUN!"

28. In reaction, defendants P.O. ROMERO, SGT. CONLON, P.O. CIANCELLO (or CHINCULO), SGT. BASKINGER, and other officers then began kicking the plaintiff in the face. In sum, said individual defendants kicked the plaintiff in his face approximately four (4) or five (5) times before the plaintiff went unconscious.

29. While this beating was ongoing, defendants P.O. BAJANA, P.O. ACOSTA, P.O. MATOS, P.O. CHENG, SGT. VEGA, P.O. STEWART, P.O. CHIN, and P.O. CLAUDIO PAULA opened the other car doors and removed the other occupants.

30. Defendants P.O. BAJANA, P.O. ACOSTA, P.O. MATOS; P.O. CHENG, SGT. VEGA, P.O. STEWART, P.O. CHIN, and P.O. CLAUDIO witnessed defendants P.O. ROMERO, SGT. CONLON, P.O. CIANCELLO (or CHINCULO), SGT. BASKINGER, and other officers wantonly and sadistically stomp and kick the plaintiff, and they knew defendants P.O. ROMERO, SGT. CONLON, P.O. CIANCELLO (or CHINCULO), and SGT. BASKINGER did not have justification to use that level of force upon the plaintiff.

31. Moreover, due to their close proximity to the beating, defendants P.O. BAJANA, P.O. ACOSTA, P.O. MATOS, P.O. CHENG, SGT. VEGA, P.O. STEWART, P.O. CHIN, and P.O. CLAUDIO reasonably could have intervened to prevent this use of force, but they willingly and maliciously chose not to do so.

32. When the plaintiff regained consciousness some time later, he noticed an officer, *to wit*, one of the individual defendants, standing over him. Upon information and belief, this officer is defendant P.O. SBERNA.

33. The plaintiff further noticed defendant P.O. SBERNA was unconcerned with his obvious injuries, to wit, she was not seeking medical attention for the plaintiff despite her

observations that plaintiff's face was bleeding profusely and plaintiff's shirt was covered in blood.

34. Despite the plaintiff's repeated pleas for help, defendant P.O. SBERNA hovered over the plaintiff for approximately fifteen (15) more minutes before she sought any emergency medical assistance for him.

35. The conduct of the individual defendants towards the plaintiff caused emergency medical personnel to cut off the plaintiff's clothes and cuff him to the post of his bed while they examined his injuries.

36. The plaintiff was then taken to Harlem Hospital while in police custody. The plaintiff remained at Harlem Hospital for five (5) days, two (2) of which were spent in the defendants' custody.

37. While in defendants' custody at Harlem Hospital the night of the incident, a detective came into the plaintiff's room and informed him that Peguero was dead. The plaintiff also learned that Heredia was shot, beaten and arrested, while Liriano was beaten and released. Upon information and belief, the name of this is detective Delano Grant.

38. Upon information and belief, officers obtained a search warrant to search the Cadillac involved in this incident.

39. Upon information and belief, defendants CPT. OLSEN and P.O. MARKOWSKI executed the search warrant on the Cadillac and seized its contents, including but not limited to plaintiff's cellular phone, designer clothes, and jewelry.

40. Defendants CPT. OLSEN and P.O. MARKOWSKI recklessly or negligently vouchered plaintiff's property in such a manner that none of the property would ever be returned to the plaintiff.

41. The next day, while still in defendants' custody, the plaintiff was visited by an assistant district attorney ("ADA") and two (2) detectives.  The ADA asked the plaintiff if he would like to cooperate with the investigation.  The plaintiff replied by giving his attorneys' contact information to the ADA and the ADA left shortly thereafter.

42. During his time in defendants' custody at Harlem Hospital, the plaintiff repeatedly asked the officers to allow him to call his family.

43. Shortly after the ADA and the detectives left the plaintiff's hospital room, the plaintiff was transferred to a non-secure room of the hospital where he remained for approximately three (3) more days to receive treatment for injuries inflicted by the individual defendants.

44. While convalescing in the non-secure room, plaintiff was visited by an officer from the NYPD's Internal Affairs Bureau ("IAB") who asked the plaintiff whether he would like to give a statement.  The plaintiff agreed, and he gave a statement about the incident to the IAB officer

45. The wound to the back of the plaintiff's head, caused by a bullet shot by one of the individual defendants, required six (6) staples to close.

46. For all five (5) days in the hospital, the plaintiff suffered from debilitating headaches caused by the individual defendants' repeated kicks to plaintiff's head.

47. For all five (5) days in the hospital, the plaintiff required daily visits to the eye clinic in the hospital in order to treat injuries caused by the individual defendants' repeated kicks to the plaintiff's face.

48. Upon release from the hospital, the plaintiff required several follow-up visits to the eye clinic at Harlem Hospital and his private physician.

49. The plaintiff still suffers from impaired vision in his right eye due to the beating by the individual defendants.

50. The plaintiff incurred significant out-of-pocket costs to cover many of his medical expenses.

51. Since the incident, the NYPD has had custody of plaintiff FLORES' car and, through its officers, has consistently refused to release the plaintiff's car from their custody, thereby depriving the plaintiff of its use and enjoyment without justification.

52. Since the incident, the NYPD has also refused to return the other valuable items seized from plaintiff's person and from the Cadillac, despite having no legal justification to maintain custody of said items, thereby depriving plaintiff of their use and enjoyment.

53. The defendants' conduct in killing Peguero, shooting Heredia and the plaintiff, and beating the plaintiff into unconsciousness caused the plaintiff to suffer profound emotional and psychological injuries.

54. In the months following the incident herein described, the plaintiff suffered from grief and bouts of depression, causing the plaintiff to cry uncontrollably, develop a short temper, avoid leaving his bed and/or apartment for weeks at a time, avoid being in public, and fear being alone.

55. The plaintiff also feels afraid when he is in a car or other vehicle as a result of the individual defendants' conduct.

56. The plaintiff remains in fear of police officers as a result of the individual defendants' conduct.

57. As a result of said emotional and psychological injuries, the plaintiff has sought treatment from a psychologist.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS UNDER THE
## <u>UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983</u>

58. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

59. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

a.   Freedom from unreasonable seizure of his person, including the excessive use of force;

b.   Freedom from arrest without probable cause;

c.   Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

d.   Freedom from cruel and unusual punishment via deliberate indifference plaintiff's basic medical needs;

e.   Freedom from malicious or sadistic state action upon the plaintiff which shocks the conscience;

f.   Freedom from abuse of process;

g.   Freedom from deprivation of liberty without due process of law; and

       h.     The enjoyment of equal protection, privileges and immunities under the laws.

60. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

61. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

62. By failing to remedy the wrongs committed by his or her subordinates, and in failing to properly train, screen, supervise, or discipline his or her subordinates, supervisory officers SGT. SCHWARZ, SGT. CONLON, SGT. BASKINGER (Shield No. 3032); SGT. VEGA; SGT. MICHEL, and CPT. OLSEN caused damage and injury in violation of plaintiff's rights guaranteed under 42 U.S.C. §1983, and the United States Constitution, including its First, Fourth, and Fourteenth Amendments.

63. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## THIRD CLAIM
## FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983

64. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

65. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe

another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

66. Defendants SGT. SCHWARZ, P.O. BAJANA, P.O. ACOSTA, P.O. MATOS; P.O. CHENG, SGT. VEGA, P.O. STEWART, P.O. CHIN, and P.O. CLAUDIOwere present for the above-described incident and witnessed other defendants, *to wit*, P.O. LABATE, P.O. DOE 3 and P.O. DOE 4 unlawfully arrest the plaintiff.

67. Defendants' use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendants SGT. SCHWARZ, P.O. BAJANA, P.O. ACOSTA, P.O. MATOS; P.O. CHENG, SGT. VEGA, P.O. STEWART, P.O. CHIN, and P.O. CLAUDIO failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by defendants P.O. LABATE, SGT. SCHWARZ, P.O. ROMERO, SGT. CONLON, P.O. CIANCELLO (or CHINCULO), and SGT. BASKINGER.

68. Defendants SGT. SCHWARZ, P.O. BAJANA, P.O. ACOSTA, P.O. MATOS; P.O. CHENG, SGT. VEGA, P.O. STEWART, P.O. CHIN, and P.O. CLAUDIO violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

### FOURTH CLAIM
### *MONELL* CLAIM AGAINST DEFENDANT CITY- 42 U.S.C. § 1983

69. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

70. All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY OF NEW YORK which were in existence at the time of the conduct alleged herein and were

engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

71. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

72. The defendants arrested and detained the plaintiff for two (2) days in Harlem Hospital in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and detention would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

73. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

74. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a. Using excessive force on individuals without justification;

    b. Arresting persons known to be innocent in order to meet "productivity goals" (*i.e.*, arrest quotas);

    c. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i. in order to protect other officers; and

        ii. in order to meet said productivity goals; and

      iii.  in order to chill or obstruct persons from lawfully observing arrests of persons in public; and

    d.  Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

75. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

    a.  *Long v. City of New York*, United States District Court, Southern District of New York, 09 Civ. 9216 (AKH) (officer who purposefully swore out a false complaint and used excessive force is prosecuted for perjury and for recklessly using physical force; the plaintiff was engaged in expressive conduct, *to wit*, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

    b.  *Lin v. City of New York*, United States District Court, Southern District of New York, 09 Civ. 1936 (PGG) (officers arrest person lawfully photographing an arrest in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);

    c.  *Colon v. City of New York*, United States District Court, Eastern District of New York, 09 Civ. 00008.   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal*/*Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

    d.  *Callaghan v. City of New York*, United States District Court, Southern District of New York, 07 Civ. 9611 (PKC) (officers accused of falsifying evidence and retaliatory

arrests of bicyclists engaged in expressive conduct, *to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

e. *MacNamara v. City of New York*, United States District Court, Southern District of New York, 04 Civ. 9216 (RJS) (JCF) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

f. *McMillan v. City of New York*, United States District Court, Eastern District of New York, 04 Civ. 3990 (FB) (RML) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

g. *Avent v. City of New York*, United States District Court, Eastern District of New York, 04 Civ. 2451 (CBA) (CLP) (same);

h. *Smith v. City of New York*, United States District Court, Eastern District of New York, 04 Civ. 1045 (RRM) (JMA) (same);

i. *Kunstler v. City of New York*, United States District Court, Southern District of New York, 04 Civ. 01145 (RWS) (MHD) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiffs' political beliefs)

j. *Allen v. City of New York*, United States District Court, Southern District of New York, 03 Civ. 2829 (KMW) (GWG) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

k. *Dotson v. City of New York*, United States District Court, Southern District of New York, 03 Civ. 2136 (RMB) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

l. *Richardson v. City of New York*, United States District Court, Eastern District of New York, 02 Civ. 3651 (JG) (CLP) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

m. *Taylor v. City of New York*, United States District Court, Eastern District of New York, 01 Civ. 5750 (ILG) (MDG) (same, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified).

76. These cases reveal an unbroken chain of a willingness by NYPD officers to falsify evidence in order to justify baseless arrests.

77. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. As reported by the media on January 20, 2006, Deputy Commissioner Paul J. Browne admitted that commanders are permitted to set "productivity goals."

b. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[1]

c. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[2]

---

[1]     *See*, Tom Namako Tom and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_ m7iRAd9b4E9alYPuGvy5OO.

[2]     *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; see also Kirstin Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html.

    d.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month.  According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[3]

78. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

    a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse.  It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself.  As a

---

[3]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[4]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged: "When it happens, it's not for personal gain. It's more for convenience."[5]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and

---

[4]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[5]     *See*, Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

misconduct.[6]  When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s).  Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions."  Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008.  Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[7]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[8]

79. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory

---

[6]        In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See* CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[7]        *See*, Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[8]        *See*, Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner KELLY.

80. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[9]

> […]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful.  As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."[10]

---

[9]     Mollen Commission Report, p. 36.

[10]    Mollen Commission Report, pp. 40-41.

b.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully.

c.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD.

d.  Former NYPD Commissioner Robert Daly write in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

e.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel.  The suspect was released.[11]  Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said.
> "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

---

[11]   *See*, Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[12]

f.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel.  Mr. Kim was convicted of those offenses.  The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids."   The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest.  According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[13]

g.  The CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer[14] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.   In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when

---

[12]    *See*, *id*.

[13]    *See*, John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[14]    In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer.  *See*, Marzulli, John, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://www.nydailynews.com/ny_local/2010/01/08/ 2010-01-08_city_shells_out_35g_to_granny_busted_as_hooker.html.

the plaintiff had never been arrested for this offense."  According to the attorney for the Patrolmen's Benevolent Association said that disciplinary charges against the officer are pending.[15]

81. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner Raymond KELLY ("KELLY") who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

82. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the right:

   a.  Not to be deprived of liberty without due process of law;

   b.  To be free from seizure and arrest not based upon probable cause;

   c.  Not to have excessive force imposed upon him;

---

[15]    *See*, *id*.

    d.  To be free from unlawful search;

    e.  To be free from malicious abuse of process; and

    f.  To receive equal protection under the law.

83. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of her rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

84. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the constitutions and laws of the United States.

85. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

86. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY

policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights.  Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

87. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

88. The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

89. Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of the plaintiff, as alleged herein.

90. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

**FIFTH CLAIM**
**RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK**
**FOR STATE LAW VIOLATIONS**

91. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

92. The conduct of the individual defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as New York City POLICE OFFICERS, and/or while they were acting as agents and employees of defendant THE CITY OF NEW YORK, clothed with and/or invoking state power and/or authority, and, as a result, defendant THE CITY OF NEW YORK is liable to plaintiff pursuant to the state common law doctrine of respondeat superior.

93. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SIXTH CLAIM**
**ASSAULT AND BATTERY**

94. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

95. By the actions described above, defendants did inflict assault and battery upon plaintiff.  The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.

96. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SEVENTH CLAIM**
**FALSE ARREST AND FALSE IMPRISONMENT**

97. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

98. By the actions described above, defendants caused to be falsely arrested or falsely arrested plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.

99. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM
## ABUSE OF PROCESS

100.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

101.    By the conduct and actions described above, defendants employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm the plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to the plaintiff, which was outside the legitimate ends of the process.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.

102.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## NINTH CLAIM
## <u>INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

103.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

104.    By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and constitution and laws of New York.

105.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## TENTH CLAIM
## <u>VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW</u>

106.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

107.    By the actions described above, defendants violated the plaintiff's right to equal protection of law.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.

## ELEVENTH CLAIM
## <u>NEGLIGENCE</u>

108.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

109.    The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff.   The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.

110.    As a result of the foregoing, the plaintiff was deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TWELFTH CLAIM**
**NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING**

111.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

112.    Defendant THE CITY OF NEW YORK negligently hired, screened, retained, supervised, and trained defendants.   The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.

113.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**THIRTEENTH CLAIM**
**CONVERSION**

114.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

115.    By confiscating plaintiff's property from at the time of his beating, arrest and/or detention, and thereafter, and by intentionally and maliciously refusing to return such

property to the plaintiff despite his unambiguous claim of right, the defendants have interfered, and are continuing to interfere, with plaintiff's property rights to plaintiff's exclusion.

116.    The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the constitution and laws of New York.  The defendants, therefore, are liable for conversion for all properties confiscated from the plaintiff which have not been returned to him in an unharmed condition.

117.    As a result of the foregoing, plaintiff has been deprived of the use and enjoyment of his properties without legal justification, resulting in costs, expenses, emotional anguish and other damages and injuries.

WHEREFORE, the plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.    For such other further and different relief as to the Court may seem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

///

///

///

Dated:  New York, New York
         December 22, 2010

                                    Respectfully Submitted,

                                    /s/
                         By:    _____
                                    David B. Rankin (DR 0863)
                                    Robert M. Quackenbush (RQ 0427)
                                    Law Office of Rankin & Taylor
                                    *Attorneys for Plaintiff*
                                    350 Broadway, Suite 700
                                    New York, NY 10013
                                    t: 212-226-4507